1   **WO**

2

3

4

5

6   **IN THE UNITED STATES DISTRICT COURT**

7   **FOR THE DISTRICT OF ARIZONA**

8

9   United States of America,                                    No. CR-19-1092-TUC-JGZ (BGM)

10                          Plaintiff,

11  v.                                                           **REPORT AND RECOMMENDATION**

12  Victor Gonzalez,

13                          Defendant.

14

15          Currently pending before the Court is Defendant Victor Gonzalez's Motion to

16  Suppress 4th Amendment (Doc. 76) and Motion to Suppress Violation of Miranda (Doc.

17  75).   The Government has filed its response and no replies were filed.   *See* Govt.'s

18  Response to Def.'s Mot. to Suppress 4th Amend. (Doc. 100); Govt.'s Response to Def.'s

19  Mot. to Suppress Violation of Miranda (Doc. 101).   Defendant is charged with one (1)

20  count of conspiracy to smuggle firearms and ammunition from the United States into the

21  Republic of Mexico in violation of Title 18, United States Code, Section 554(a) and one

22  (1) count of smuggling ammunition in violation of Title 18, United States Code, Section

23  554(a).   Indictment (Doc. 23).   Defendant seeks suppression of all evidence obtained as a

24  result of an allegedly faulty investigatory stop.   *See* Def.'s Mot. to Suppress 4th

25  Amendment (Doc. 76).   Defendant also seeks suppression of any statements made due to

26  law enforcement's alleged failure to give him *Miranda* warnings.   *See* Def.'s Mot. to

27  Suppress Violation of Miranda (Doc. 75).

28          Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for

1   an evidentiary hearing and a report and recommendation.   The Magistrate Judge

2   recommends that the District Court, after its independent review, grant Defendant's motion

3   to dismiss regarding the Fourth Amendment and deny his motion regarding *Miranda*.

4

5   **I.      FACTUAL BACKGROUND**

6         On April 8, 2019, Arizona Department of Public Safety ("AZDPS") Trooper

7   Christopher Amick  was on patrol.  Hr'g Tr. 2/3/2020 (Doc. 155) at 6:14–19.   Trooper

8   Amick is currently employed as a canine handler with AZDPS and assigned to the canine

9   district in Tucson.  *Id.* at 6:8–13, 24:23–25.

10         Homeland Security Investigations ("HSI") Special Agent ("SA") Jacob Boisselle is

11   assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on a

12   weapons trafficking/weapons smuggling task force.  *Id.* at 52:11–17.  Although he belongs

13   to HSI, SA Boisselle is tasked to ATF and works with ATF agents on a regular basis.  *Id.*

14   at 52:18–25.   The task force's focus is weapons trafficking and weapons smuggling

15   outbound from the United States and into Mexico.  *Id.* at 53:1–5.  SA Boisselle explained

16   that because AZDPS monitors the highways and freeways, they are often going to be the

17   first to encounter possible weapons and ammunitions smugglers.  Hr'g Tr. 2/3/2020 (Doc.

18   155) at 53:10–17.  As a result, the task force and AZDPS have an informal understanding

19   that when AZDPS troopers encounter potential weapons or ammunition smuggling into

20   Mexico, they notify the ATF task force.  *Id.* at 53:18–23, 71:12–20.

21       *A.      The Stop*

22         Trooper Amick  testified that while on patrol, part of his regular job duties include

23   conducting checks for mandatory insurance and conducting traffic stops.  Hr'g Tr. 2/3/2020

24   (Doc. 155) at 7:25–8:19.  Trooper Amick explained that he runs license plates through the

25   Arizona Motor Vehicle Department ("MVD") via the Computer Aided Dispatch ("CAD")

26   on his computer and the information returned includes the registered owner and any

27   comments that the MVD may have attached.  *Id.* at 8:7–15.  On April 8, 2019, Trooper

28   Amick ran a check on the license plate of a black Lincoln Navigator.  *Id.* at 7:20–24, 9:3–

1    6. Trooper Amick testified that his vehicle and the Navigator were traveling southbound

2    on Interstate 19.  *Id.* at 9:7–10, 25:1–6.  Trooper Amick further testified that when he ran

3    the Navigator's license plate, the information returned indicated that it was suspended for

4    a mandatory insurance suspension.  *Id.* at 7:20–24, 25:7–17.  Trooper Amick confirmed

5    that this was a violation of Arizona traffic code.  Hr'g Tr. 2/3/2020 (Doc. 155) at 8:20–24.

6    Trooper Amick testified that he initiated a traffic stop of the Navigator at approximately

7    milepost 58 of southbound I-19.  *Id.* at 6:20–22, 8:5–9:2, 9:11–21, 24:12–22.  Defendant

8    Gonzalez confirmed that he had merged onto I-19 traveling southbound at Valencia and

9    was stopped shortly thereafter.  *Id.* at 93:21–94:20.

10        Trooper Amick further testified that he made contact with the driver, Defendant

11   Victor Antonio Gonzalez.  *Id.* at 10:4–14.  Trooper Amick asked for Mr. Gonzalez's

12   license, registration, and proof of insurance.  *Id.* at 10:11–14.  Trooper Amick testified that

13   Mr. Gonzalez expressed uncertainty regarding the location of the insurance.  Hr'g Tr.

14   2/3/2020 (Doc. 155) at 10:11–14.  Mr. Gonzalez confirmed that Trooper Amick stopped

15   the vehicle but testified that he provided his license, registration, and proof of insurance.

16   *Id.* at 94:23–95:11.  Trooper Amick issued a warning for displaying plates suspended for

17   financial responsibility to Defendant Gonzalez.  *Id.* at 11:15–12:2, 48:16–25.  Trooper

18   Amick testified that in addition to Mr. Gonzalez there was a passenger in the vehicle, Jose

19   Alberto Diaz.  *Id.* at 9:19–10:10, 25:22–25.  Trooper Amick also testified that his initial

20   encounter with Mr. Gonzalez lasted for approximately five (5) to ten (10) minutes and they

21   stood next to Trooper Amick's patrol car during this time.  *Id.* at 13:3–7, 27:8–18, 28:5–

22   15, 32:10–12.  Mr. Gonzalez testified that Trooper Amick returned to his patrol vehicle

23   after receiving the paperwork and returned five (5) to ten (10) minutes later and asked

24   where Mr. Gonzalez was going.  Hr'g Tr. 2/3/2020 (Doc. 155) at 95:12–18, 96:9–22.  Mr.

25   Gonzalez further testified that upon Trooper Amick's return, he asked the trooper the

26   reason for the stop a second time.  *Id.*  Mr. Gonzalez testified that Trooper Amick told him

27   that he was stopped because there was a violation of the registration.  *Id.*  Mr. Gonzalez

28   also testified that it was at this point that Trooper Amick instructed him to get out of the

1   car and according to Mr. Gonzalez he argued with the trooper and showed him that the tags

2   on the license plates were not expired.  *Id.* at 95:19–96:6, 96:23–97:1.  Mr. Gonzalez then

3   testified that after that Trooper Amick said that the violation was because the car did not

4   have insurance, at which point Mr. Gonzalez remembered that he had bought some

5   insurance before travelling to Tucson and had the piece of paper in the center console.  Hr'g

6   Tr. 2/3/2020 (Doc. 155) at 96:1–6.  Mr. Gonzalez further testified that he showed Trooper

7   Amick the piece of paper.  *Id.* at 96:7–8, 96:23–27:1.  Mr. Gonzalez testified that he does

8   not have any evidence that he bought insurance, but he stated bought it in Nogales, Sonora,

9   Mexico for $12; however, he cannot identify where he purchased it.  *Id.* at 109:8–110:25

10       Trooper Amick testified that Mr. Gonzalez did not dispute the warning.  *Id.* at 13:8–

11   11.  Trooper Amick further testified that when he was typing the information in his

12   computer for the warning, sometimes there was a delay for information to comeback

13   because of the Internet.  *Id.* at 13:12–20, 27:25–28:4.  Trooper Amick explained that while

14   he was waiting for the information, he would talk with Mr. Gonzalez.  *Id.* at 13:12–24.

15   Trooper Amick testified that he asked Mr. Gonzalez where they were coming from.  Hr'g

16   Tr. 2/3/2020 (Doc. 155) at 14:7–11, 26:13–15.  Mr. Gonzalez indicated that he had been in

17   Tucson and was headed back to Nogales.  *Id.*  Trooper Amick further testified that Mr.

18   Gonzalez indicated that he had borrowed the vehicle from a friend and that Mr. Diaz was

19   also a friend.  *Id.* at 14:12–17, 108:8–18, 108:25–109:7.  Trooper Amick reported that Mr.

20   Gonzalez stated that he and Mr. Diaz were going to visit Mr. Gonzalez's child's mother

21   and he had wanted Mr. Diaz to accompany him.  *Id.* at 18–25.

22       Trooper Amick testified that he instructed Mr. Gonzalez to remain by the patrol car

23   and made contact with the passenger, Mr. Diaz.  *Id.* at 15:8–14, 28:19–23.  Trooper Amick

24   further testified that he tried to give Mr. Diaz the chance to locate the insurance card in the

25   glove compartment.  Hr'g Tr. 2/3/2020 (Doc. 155) at 15:8–14, 28:19–23.  As Mr. Diaz

26   searched for the insurance card, Trooper Amick asked him where they were coming from.

27   *Id.* at 15:19–24, 16:6–7.  Trooper Amick noted that Mr. Diaz hesitated in responding and

28   initially said that they were coming from Nogales, but later said that they were coming

1    from Phoenix.  *Id.* at 16:6–22.  Mr. Diaz was unable to locate the insurance card.  *Id.* at

2    16:23–25.  Trooper Amick confirmed that he checked both occupants' identification, and

3    their driver's licenses had addresses from Nogales, Arizona.  *Id.* at 26:16–21.

4         Trooper Amick testified that when he delivered the driver a copy of the warning, he

5    asked Mr. Gonzalez a second time where he and Mr. Diaz were coming from.  Hr'g Tr.

6    2/3/2020 (Doc. 155) at 17:1–14.  Trooper Amick further testified that Mr. Gonzalez had

7    seemed nervous and he and Mr. Diaz had conflicting stories, which prompted Trooper

8    Amick to ask again.  *Id.*  Trooper Amick also observed that because the enforcement action

9    was completed, he thought Mr. Gonzalez would be less nervous in answering.  *Id.*  Trooper

10   Amick further noted that the difference in responses suggested to him that criminal activity

11   may be occurring.  *Id.* at 17:15–17.  Upon further questioning, Mr. Gonzalez responded

12   that they were coming from Phoenix.  *Id.* at 17:18–18:13.  Trooper Amick testified that the

13   time for the enforcement action was not extended to this point, as he was still in the process

14   of returning Mr. Gonzalez's license and registration, as well as having him sign the

15   warning.  Hr'g Tr. 2/3/2020 (Doc. 155) at 18:14–19:4.

16        Trooper Amick further testified that as he returned the paperwork to Mr. Gonzalez,

17   Trooper Amick asked if he could speak with him to ask him a few questions.  *Id.* at 19:3–

18   7.  Trooper Amick explained that as Mr. Gonzalez turned to return to his vehicle, Trooper

19   Amick asked if he could speak with him further.  *Id.* at 32:15–33:2.  Trooper Amick

20   acknowledged that once he returned the paperwork to Mr. Gonzalez, his enforcement

21   action was completed.  *Id.* at 30:7–15.  Trooper Amick testified that he requested

22   permission to speak further and to search the vehicle immediately after he returned the

23   paperwork to Mr. Gonzalez.  *Id.* at 19:13–17, 31:12–17.  Mr. Gonzalez agreed to speak

24   with Trooper Amick and also agreed to a search of the vehicle.  Hr'g Tr. 2/3/2020 (Doc.

25   155) at 19:8–25.  Trooper Amick further testified that he asked for consent to search

26   because the conflicting stories by Mr. Gonzalez and Mr. Diaz indicated some sort of

27   deception.  *Id.* at 19:18–22.  Trooper Amick noted that he did not know what specific crime

28   may have occurred but was suspicious that something was going on.  *Id.* at 31:18–25.  Mr.

1    Gonzalez did not hesitate prior to granting consent to search and signed a written consent

2    form. *Id.* at 20:1–21:6.

3         Mr. Gonzalez testified that Trooper Amick did not ask him where he was going until

4    after Trooper Amick returned from his patrol vehicle and Mr. Gonzalez showed him his

5    proof of insurance. *Id.* at 96:23–97:4.  Mr. Gonzalez further testified that Trooper Amick

6    had not given him a warning.  Hr'g Tr. 2/3/2020 (Doc. 155) at 97:5–13.  Mr. Gonzalez

7    confirmed that at this point they were standing by the front fender of Trooper Amick's

8    patrol vehicle when Trooper Amick began asking Mr. Gonzalez about where he was

9    travelling, who he was with, and what they were doing in Tucson.  *Id.* at 97:10–19.  Mr.

10   Gonzalez testified that when Trooper Amick asked if he could search the vehicle, Mr.

11   Gonzalez said "no" because it was not his vehicle, it belonged to a friend.  *Id.* at 97:20–25,

12   111:1–3.  Mr. Gonzalez further testified that Trooper Amick had not given him the citation

13   yet.  *Id.* at 98:1–6.  According to Mr. Gonzalez, he did not receive any paperwork until he

14   was released and on the way to the shuttle.  *Id.* at 98:5–12, 102:20–103:1, 111:16–25.  Mr.

15   Gonzalez also testified that once he declined the search, Trooper Amick said that he was

16   going to call for a search warrant or canine.  Hr'g Tr. 2/3/2020 (Doc. 155) at 98:17–22.

17   Mr. Gonzalez denied that Trooper Amick had a canine with him.  *Id.* at 98:23–24.  Mr.

18   Gonzalez indicated that once Trooper Amick said he would get a search warrant, Mr.

19   Gonzalez agreed to the search and signed the consent.  *Id.* at 99:3–4, 99:22–24, 111:4–5,

20   112:3–18, 115:5–10.  Mr. Gonzalez testified that Trooper Amick frisked him, told him to

21   stand by the side of the road, and then went to talk to Mr. Diaz.  *Id.* at 99:5–14.

22        Once Mr. Gonzalez signed the consent form, Trooper Amick asked Mr. Diaz to exit

23   the vehicle and directed both driver and passenger to stand off to the side.  *Id.* at 21:14–17,

24   36:2–24.  Trooper Amick acknowledged that Mr. Gonzalez had not threatened him up until

25   that point but frisked him pursuant to standard procedure for his safety prior to performing

26   a vehicle search.  Hr'g Tr. 2/3/2020 (Doc. 155) at 34:8–35:7, 36:10–13, 47:1–48:10.

27   Trooper Amick testified that upon conducting the search he discovered a large amount,

28   estimating approximately 10,000 rounds, of ammunition in the back cargo area of the

1    Navigator.  *Id.* at 21:18–22:3.  Trooper Amick further testified that this amount of

2    ammunition was indicative of criminal activity, especially in light of the destination being

3    Nogales, Arizona.  *Id.* at 22:4–12, 37:10–13, 50:11–51:14.  As a result, Trooper Amick

4    contacted the ATF and waited for an agent to arrive on scene.  *Id.* at 22:19–23:5.  SA

5    Boisselle confirmed that Trooper Amick contacted him via his cellular telephone that day.

6    *Id.* at 53:24–54:7, 71:21–22.  SA Boisselle testified that Trooper Amick indicated that he

7    had stopped a vehicle containing a large amount of ammunition.  Hr'g Tr. 2/3/2020 (Doc.

8    155) at 54:8–14.  SA Boisselle further testified that he immediately dispatched to Trooper

9    Amick's location.  *Id.* at 54:15–16.  Trooper Amick placed Mr. Gonzalez and Mr. Diaz in

10   handcuffs and explained they were being detained while they waited for ATF to arrive.  *Id.*

11   at 37:19–38:5.  During this time, Trooper Amick also notified his dispatch and another

12   canine trooper appeared on scene.  *Id.* at 38:6–9.

13            SA Boisselle testified that the ATF task force does not dispatch to every notification

14   of ammunition found during a traffic stop; however, during April 2019 they had seized

15   approximately 100,000 rounds through various interdiction activities for attempted

16   smuggling of ammunition to Mexico and were seeing a lot of vehicles with eight-, ten-,

17   twenty-, or thirty-thousand rounds.  *Id.* at 55:11–24.  SA Boisselle acknowledged that it is

18   not illegal to possess ammunition per se; however, transporting ammunition with the intent

19   to smuggle it into Mexico is illegal.  Hr'g Tr. 2/3/2020 (Doc. 155) at 55:25–56:5.  SA

20   Boisselle observed that 10,000 rounds of ammunition is not usually possessed under lawful

21   circumstances.  *Id.* at 56:9–15, 78:9–13.  Trooper Amick testified that once an ATF agent

22   was on scene, he had no further involvement in the investigation beyond issuing a vehicle

23   removal report.  *Id.* at 23:3–8, 42:3–43:21, 46:13–17.

24        ***B.     ATF Investigation***

25            SA Boisselle and ATF SA Rob Kilcoyne arrived on scene in separate vehicles.  Hr'g

26   Tr. 2/3/2020 (Doc. 155) at 56:16–25.  Mr. Gonzalez testified that SA Boisselle arrived on

27   scene alone.  *Id.* at 101:25–3.  SA Boisselle testified that he spoke with Trooper Amick,

28   who described the situation.  *Id.* at 56:16–25, 67:13–16.  SA Boisselle further testified that

1   he decided to speak with Mr. Diaz first.  *Id.*  SA Boisselle noted that he generally speaks

2   with the passenger first, because they are not in control of the vehicle, and his interview

3   with Mr. Diaz was not long.  *Id.* at 57:11–20.  Mr. Gonzalez confirmed that SA Boisselle

4   spoke with Mr. Diaz first.  Hr'g Tr. 2/3/2020 (Doc. 155) at 101:4–5.

5        SA Boisselle testified that after speaking with Mr. Diaz, he and SA Kilcoyne spoke

6   with Mr. Gonzalez.  *Id.* at 57:21–23.  SA Boisselle further testified that Mr. Gonzalez was

7   detained at the time of questioning, was escorted to the agent's vehicle, and his handcuffs

8   removed.  *Id.* at 57:24–58:5, 68:21–69:4.  SA Boisselle and SA Kilcoyne explained to Mr.

9   Gonzalez that they were going to talk to him about the ammunition in the vehicle.  *Id.* at

10  58:1–5.  SA Boisselle testified that he advised Mr. Gonzalez of his *Miranda* rights, and

11  Mr. Gonzalez agreed to waive those rights.  *Id.* at 58:6–13.  SA Boisselle further testified

12  that Mr. Gonzalez signed a waiver of rights form.  Hr'g Tr. 2/3/2020 (Doc. 155) at 58:6–

13  13, 59:8–20, 112:21–113:19.  Mr. Gonzalez confirmed that he voluntarily signed a waiver

14  of rights form.  *Id.* at 111:6–15.  SA Boisselle observed that Mr. Gonzalez was honest and

15  forthcoming during the investigation.  *Id.* at 78:14–79:14.  Following the interview of Mr.

16  Gonzalez and Mr. Diaz, both men were released and allowed to leave.  *Id.* at 60:14–21,

17  69:24–70:9.  Mr. Gonzalez noted that the agents seized the ammunition prior to driving

18  him and Mr. Diaz to the shuttle upon release.  *Id.* at 102:6–19.

19        *C.     Arrest*

20        On May 23, 2019, an arrest warrant was issued and Mr. Gonzalez was arrested on

21  May 28, 2019 while entering the United States at the Nogales Port of Entry.  Hr'g Tr.

22  2/3/2020 (Doc. 155) at 61:2–62:1, 72:7–13; Arrest Warrant & Return (Doc. 35).  Mr.

23  Gonzalez confirmed that he was detained when crossing on foot.  Hr'g Tr. 2/3/2020 (Doc.

24  155) at 103:2–22.  SA Boisselle and SA Jason Red responded to the Port of Entry to

25  transport Mr. Gonzalez.  *Id.* at 62:2–4, 74:1–8.  SA Boisselle testified that Mr. Gonzalez

26  was detained at the Port of Entry, and SA Boisselle explained to him that they were going

27  to the HSI Nogales office to process him.  *Id.* at 61:5–20, 72:18–23.  SA Boisselle further

28  testified that initially he did not ask Mr. Gonzalez any questions because all of the

1    information that he had was from the initial interview.  *Id.* at 61:5–20.  SA Boisselle

2    acknowledged that he did not give Mr. Gonzalez his *Miranda* warnings.  *Id.* at 72:24–

3    73:15, 77:6–7.  SA Boisselle testified that once they were in the car, Mr. Gonzalez stated

4    that during the initial interview he had described the person to whom the ammunition was

5    going using a nickname but then offered the individual's actual name.  Hr'g Tr. 2/3/2020

6    (Doc. 155) at 62:23–63:3, 76:21–77:5.  SA Boisselle further testified that Mr. Gonzalez

7    made this statement completely unsolicited and expressed a desire to assist with the

8    investigation.  *Id.* at 63:4–14, 79:23–80:1.  Mr. Gonzalez denied that he volunteered the

9    information and testified that Agent Red questioned him regarding Duende's real name

10   and who else was involved.  *Id.* at 103:23–104:5.

11         SA Boisselle testified that Mr. Gonzalez proceeded to give further statements about

12   co-conspirators involved in his offense.  *Id.* at 63:15–17.  Mr. Gonzalez testified that SA

13   Red knew about the involvement of other people because he had searched his cellular

14   telephone on April 8, 2019.  *Id.* at 104:17–105:22.  Mr. Gonzalez explained that he had

15   unlocked his phone and given permission to SA Red to look through it, when SA Red told

16   him that he would get a search warrant if Mr. Gonzalez did not unlock the phone.  Hr'g Tr.

17   2/3/2020 (Doc. 155) at 104:17–105:22.  SA Boisselle noted that Mr. Gonzalez never

18   indicated that he wished to stop talking further or otherwise invoke his *Miranda* rights.  *Id.*

19   at 63:18–21.  SA Boisselle also noted that for a long portion of the drive Mr. Gonzalez

20   used the agent's cellular telephone to talk with his wife and son in Mexico.  *Id.* at 73:16–

21   21.  After transporting Mr. Gonzalez to the detention facility, SA Boisselle did not have

22   further contact with him.  *Id.* at 63:22–64:1.

23         **D.    *Transport to Federal Courthouse***

24         ATF Special Agent Creighton Brandt accompanied  HSI SA Jason Red to the Pima

25   County Jail in order to transport an individual from the jail to the federal courthouse for an

26   initial appearance.  Hr'g Tr. 2/3/2020 (Doc. 155) at 81:9–24.  SA Brandt had not had any

27   prior involvement in the investigation of Mr. Gonzalez or other co-defendants in this

28   matter.  *Id.* at 81:25–82:3.  SA Brandt testified that he and SA Red traveled to the Pima

1    County Jail and took custody of Mr. Gonzalez.  *Id.* at 83:9–23.  SA Brandt observed that

2    Mr. Gonzalez was a friendly, likeable person.  *Id.* at 83:9–23, 86:23–87:2.  SA Brandt

3    further testified that at the jail, Mr. Gonzalez changed into the street clothes that the agents

4    had brought for him and then they went to SA Red's vehicle.  *Id.* at 83:24–84:6.  Once they

5    were outside, SA Red showed Mr. Gonzalez two (2) different photographs.  Hr'g Tr.

6    2/3/2020 (Doc. 155) at 81:9–24, 86:13–22, 88:24–89:16.  SA Brandt testified that he knew

7    SA Red was planning on showing Mr. Gonzalez photos of individuals that were potentially

8    involved in the investigation.  *Id.* at 84:12–85:4, 88:17–23.  SA Brandt indicated that when

9    Mr. Gonzalez saw the photographs, he acted affirmatively regarding the individuals

10   depicted.  *Id.* at 87:3–7, 89:22–90:4.  SA Brandt testified that he did not give Mr. Gonzalez

11   his *Miranda* warnings or witness SA Red give them.  *Id.* at 87:13–18.  SA Brandt further

12   testified that no further questions were asked of Mr. Gonzalez.  *Id.* at 87:23–88:2.  Mr.

13   Gonzalez confirmed that SA Red showed him photographs but denied recognizing any of

14   the individuals depicted.  Hr'g Tr. 2/3/2020 (Doc. 155) at 106:1–14.

15

16   **II.    ANALYSIS**

17          Defendant seeks suppression of the evidence in this case, asserting that "his

18   detention exceeded the justification for the stop as it was unnecessarily prolonged."  *See*

19   Def.'s Mot. to Suppress 4th Amend. (Doc. 76) at 4.  Defendant further asserts that he was

20   arrested without probable cause.  *Id.* at 5.  Defendant also urges that because any statements

21   made during his trip from the Pima County Jail to the federal courthouse were given

22   without *Miranda* warnings, they must be suppressed.  Def.'s Mot. to Suppress Violation of

23   *Miranda* (Doc. 75) at 4.

24          **A.     Fourth Amendment—In General**

25          "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

26   Government, and its protections extend to brief investigatory stops of persons or vehicles

27   that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct.

28   744, 750, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20

1    L.Ed.2d 889 (1968); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d

2    621 (1981)).  For the police to conduct a valid stop, they must "have a reasonable suspicion

3    supported by articulable facts that criminal activity may be afoot." *United States v.*

4    *Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (internal quotes and

5    citation omitted).  "[T]he level of suspicion required for a *Terry* stop[, however,] is

6    obviously less demanding than that for probable cause." *Id.* at 8, 109 S.Ct. at 1585 (internal

7    citations omitted).  "An investigatory stop of a vehicle is reasonable under the Fourth

8    Amendment if the officer reasonably suspects that a traffic violation has occurred." *United*

9    *States v. Miranda-Guerena*, 445 F.3d 1233, 1236 (9th Cir. 2006) (citing *United States v.*

10   *Willis*, 431 F.3d 709, 714 (9th Cir. 2005)).  It is well-established law that "the constitutional

11   reasonableness of traffic stops [does not] depend[] on the actual motivations of the

12   individual officers involved." *United States v. Whren*, 517 U.S. 806, 813, 116 S.Ct. 1769,

13   1774, 135 L.Ed.2d 89 (1996).

14        "Reasonable suspicion is defined as 'a particularized and objective basis for

15   suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *United States*

16   *v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (en banc)).  "The reasonable-suspicion

17   standard is not a particularly high threshold to reach." *Valdes-Vega*, 738 F.3d at 1078.

18   Furthermore, although "a mere hunch is insufficient to justify a stop, the likelihood of

19   criminal activity need not rise to the level required for probable cause, and it falls

20   considerably short of satisfying a preponderance of the evidence standard." *Id.* (quoting

21   *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744) (citations and internal quotation marks omitted).

22        When making a reasonable-suspicion determination, the reviewing court "must look

23   at the 'totality of the circumstances' of each case to see whether the detaining officer has a

24   'particularized and objective basis' for suspecting legal wrongdoing." *United States v.*

25   *Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citations omitted);

26   *see also United States. v. Alvarez*, 899 F.2d 833, 836 (9th Cir. 1990).  In so doing, officers

27   are allowed "to draw on their own experience and specialized training to make inferences

28   from and deductions about the cumulative information available to them that 'might well

1    elude an untrained person.'" *Id.* at 273, 122 S.Ct. at 750-51. (citations omitted); *see also*

2    *Valdes-Vega*, 738 F.3d at 1078.  Moreover, what may seem to be innocuous conduct when

3    viewed in isolation may be appropriately considered when considering the totality of the

4    circumstances; thus, it is inappropriate to view factors in isolation and to give no weight to

5    factors which may have an innocent explanation.  *Arvizu*, 534 U.S. at 273-75,  122 S.Ct. at

6    750-51; *see also Cotterman*, 709 F.3d at 970 ("It is not our province to nitpick the factors

7    in isolation but instead to view them in the totality of the circumstances.").  Furthermore,

8    "A determination that reasonable suspicion exists . . . need not rule out the possibility of

9    innocent conduct." *Valdes-Vega*, 738 F.3d at 1078-79 (citing *Arvizu*, 534 at 277, 122 S.Ct.

10   744) (alterations in original).

11        **B.    *Traffic Stop***

12             **1.  Initial stop**

13        "Defendant initially maintains that the seizure of his vehicle was without reasonable

14   suspicion that a statutory violation had occurred." Def.'s Mot. to Suppress 4th Amendment

15   (Doc. 76) at 4.  Trooper Amick, however, credibly testified that he pulled over the Lincoln

16   Navigator Defendant was driving after a license plate inquiry indicated that there was a

17   mandatory insurance suspension on the plate in violation of the Arizona traffic code.  Hr'g

18   Tr. 2/3/2020 at 7:20–24, 8:20–24, 25:7–17.   "An investigatory stop of a vehicle is

19   reasonable under the Fourth Amendment if the officer reasonably suspects that a traffic

20   violation has occurred." *United States v. Miranda-Guerena*, 445 F.3d 1233, 1236 (9th Cir.

21   2006) (citing *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005)).  The Court finds

22   that the initial traffic stop was constitutionally proper.

23             **2.  Stop extension**

24        Defendant "claims that his detention exceeded the justification for the stop as it was

25   unnecessarily prolonged."  Def.'s Mot. to Suppress 4th Amend. (Doc. 76) at 4 (citing

26   *Rodriguez v. United States*, 135 S. Ct. 1609 (2015)).   The Government asserts that

27   Defendant's "subsequent detention was not an unlawful extension of the traffic stop, but

28   instead was reasonably necessary for investigation of additional criminal offenses."

1   Govt.'s Response re 4th Amend. (Doc. 100) at 5.

2       "A seizure for a traffic violation justifies a police investigation of that violation."

3   *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 942

4   (2015).  "Like a *Terry*[1] stop, the tolerable duration of police inquiries in the traffic-stop

5   context is determined by the seizure's 'mission'—to address the traffic violation that

6   warranted the stop . . . and attend to related safety concerns[.]"  *Id.* (citations omitted).

7   "Because addressing the infraction is the purpose of the stop, it may last no longer than is

8   necessary to effectuate th[at] purpose."  *Id.* (quotations and citations omitted) (alteration in

9   original).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—

10  or reasonably should have been—completed."  *Id.* (citations omitted).

11      Applying *Rodriguez*, the Ninth Circuit Court of Appeals has observed:

12          When stopping an individual for a minor traffic violation, "an
13      officer's mission includes 'ordinary inquiries incident to [the traffic stop.'"
        *Id.* at 1615 (alteration in original) (quoting *Caballes*, 543 U.S. at 408, 125
14      S.Ct. 834).  "[S]uch inquiries involve checking the driver's license,
        determining whether there are outstanding warrants against the driver, and
15      inspecting the automobile's registration and proof of insurance," as these
16      checks are aimed at "ensuring that vehicles on the road are operated safely
        and responsibly."  *Id.*
17

18  *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015).  In *Evans*, the officer conducted

19  a traffic stop after observing the target vehicle make a lane change which caused the vehicle

20  behind it to apply its brakes.  *Id.* at 782.  After "conduct[ing] several traffic-related

21  inquiries[,] . . . Zirkle gave Evans a warning, shook Evans' hand, returned his license and

22  paperwork, and informed him that 'you're good to go.'"  *Id.* at 788.  "Zirkle then reinitiated

23  questioning, asking Evans whether contraband was present in the vehicle."  *Id.*  The court

24  of appeals held that "[p]rolonging the traffic stop to perform [a canine narcotics

25  investigation], without independent reasonable suspicion was therefore unlawful."  *Id.*

26      Here, Trooper Amick testified that he initiated the traffic stop, asked for Mr.

27  Gonzalez's license, registration, and proof of insurance, and conducted his investigation

28

        [1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

1    regarding the mandatory insurance suspension.  Hr'g Tr. 2/3/2020 (Doc. 155) at 6:20–22,

2    7:20–24,  8:5–9:2,  9:11–21,  10:4–14,  24:12–22,  25:7–17,  26:16–21.    During  the

3    investigation, Trooper Amick spoke with Mr. Gonzalez and Mr. Diaz.  *Id.* at 13:12–24,

4    15:8–24, 16:6–22, 27:25–28:4, 28:19–23.   Trooper Amick further testified that as he

5    returned the paperwork to Mr. Gonzalez and as he turned to return to his vehicle, Trooper

6    Amick asked if he could speak with Mr. Gonzalez further to ask him a few questions.  *Id.*

7    at 19:3–7, 32:15–33:2.  Trooper Amick acknowledged that once he returned the paperwork

8    to Mr. Gonzalez, his enforcement action was completed.  *Id.* at 30:7–15.

9            The Court finds Trooper Amick's testimony credible.   He appeared honest and

10   forthcoming as a witness.  Moreover, the Court finds that Defendant's testimony, such as

11   his claim that he had purchased insurance for $12 without any further information

12   regarding where he bought it or the type of insurance, was dubious and self-serving.

13   Trooper Amick's testimony, however, confirms that the traffic stop was completed when

14   he asked to speak with Mr. Gonzalez further.  "Prolonging the traffic stop to perform this

15   task, without independent reasonable suspicion" is unlawful.

16                      **3.  Reasonable Suspicion**

17          "[A]n officer may prolong a traffic stop if the prolongation itself is supported by

18   independent reasonable suspicion."  *United States v. Evans*, 786 F.3d 779, 788 (9th Cir.

19   2015).  "Reasonable suspicion exists when an officer is aware of specific, articulable facts

20   which, when considered with objective and reasonable inferences, form a basis for

21   *particularized* suspicion."  *Id.* (quotations and citations omitted) (emphasis in original).

22          Here, the Court finds that Trooper Amick did not have reasonable suspicion to

23   extend the stop.  Trooper Amick testified that he had asked for consent to search the vehicle

24   because the conflicting stories by Mr. Gonzalez and Mr. Diaz indicated some sort of

25   deception.  Hr'g Tr. 2/3/2020 (Doc. 155) at 19:18–22.  Trooper Amick noted that he did

26   not know what specific crime may have occurred but was suspicious that something was

27   going on.  *Id.* at 31:18–25.  Trooper Amick also testified, however, that he asked Mr.

28   Gonzalez where he was going a second time because the enforcement action was

completed, and he thought Mr. Gonzalez would be less nervous answering. *Id.* at 17:1–14. Trooper Amick observed that "[s]ometimes people are nervous when they're talking to law enforcement and I always try to give them a chance to not be nervous because the enforcement action has already been completed, the warning." *Id.* Trooper Amick's recognition that sometimes responses are inconsistent due to nerves demonstrates that Mr. Gonzalez's and Mr. Diaz's conflicting stories cannot form reasonable suspicion standing alone. Trooper Amick did not have any other reason for extending the stop and seeking permission to search beyond his hunch that criminal activity was afoot. This is insufficient under the Fourth Amendment. As such, Defendant Gonzalez's motion to suppress regarding the Fourth Amendment should be granted.

## C.     Miranda[2]—*In General*

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The Supreme Court of the United States has "recognized that custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Moran v. Burbine*, 475 U.S. 412, 420, 96 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966)). "To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran*, 475 U.S. at 420, 96 S.Ct. at 1140. Specifically, the Court has found the Constitution requires "that a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v.*

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966).

1    *Arizona*, 384 U.S. 436, 444 (1966)). "An officer's obligation to administer *Miranda*

2    warnings attaches . . . 'only where there has been such a restriction on a person's freedom

3    as to render him "in custody."'" *Stansbury*, 511 U.S. at 322 (quoting *Oregon v. Mathiason*,

4    429 U.S. 492, 495 (1977)).

5                    **D.      *Transport from the Pima County Jail to the Federal Courthouse***

6           Defendant asserts that any statements made during his transport from the Pima

7    County Jail to the federal courthouse must be suppressed because they were made without

8    agents giving *Miranda* warnings.  Def.'s Mot. to Suppress *Miranda* Viol. (Doc. 75) at 4.

9           Mr. Gonzalez received *Miranda* warnings on April 8, 2019 and testified that his

10   waiver was voluntary.  Hr'g Tr. 2/3/2020 (Doc. 155) at 58:6–13, 59:8–20, 111:6–15,

11   112:21–113:19.  There is no per se rule mandating "that statements made after *Miranda*

12   warnings are administered are nonetheless inadmissible if the warnings become 'stale.'"

13   *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1128 (9th Cir. 2005).  Moreover,

14   "[a]s a general proposition, the law can presume that an individual who, with a full

15   understanding of his or her rights, acts in a manner inconsistent with their exercise has

16   made a deliberate choice to relinquish the protection those rights afford."  *Berghuis v.*

17   *Thompkins*, 560 U.S. 370, 385, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010) (citations

18   omitted).  "A waiver is voluntary if, under the totality of the circumstances, the confession

19   was the product of a free and deliberate choice rather than coercion or improper

20   inducement."  *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (citations

21   omitted); *see also Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89

22   L.Ed.2d 410 (1986).

23          Here, there was no suggestion that Mr. Gonzalez's statement prior to transport were

24   coerced or improperly induced.  Prior to getting in the vehicle for transport, Mr. Gonzalez

25   viewed two photographs, briefly communicated with SA Red regarding the same, and no

26   further questions were asked.  Hr'g Tr. 2/3/2020 (Doc. 155) at 91:9–24, 86:13–22, 87:3–7,

27   87:23–88:2, 88:24–90:4, 106:1–14.  Furthermore, the Court finds that Mr. Gonzalez

28   understood and validly waived his *Miranda* rights on April 8, 2019.  The Court is troubled

by the length of time that had elapsed between the valid waiver on April 8th and the question on May 29th.  Mr. Gonzalez, however, testified that he got along well with SA Red and wanted to help both SA Red and himself out by talking.  *Id.* at 116:8–117:22.  The record also does not suggest that there was any coercion regarding SA Red's presentation of the photographs or hesitation in Mr. Gonzalez's response to those questions.  Based on the totality of the circumstances, the Court finds that Mr. Gonzalez validly waived his *Miranda* rights prior to transport on May 29, 2019.  Defendant's motion to suppress regarding a *Miranda* violation should be denied.

### III.    CONCLUSION

The Court finds that the traffic stop was improperly extended in violation of the Fourth Amendment.  The Court further finds that there was no *Miranda* violation.

### IV.    RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Judge GRANT Defendant Victor Gonzalez's Motion to Suppress 4th Amendment (Doc. 76) and DENY his Motion to Suppress Violation of Miranda (Doc. 75).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-19-1092-TUC-JGZ**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 9th day of July, 2020.

Honorable Bruce G. Macdonald
United States Magistrate Judge